# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**TYRONE RAYMOND**                                    **CIVIL ACTION**

**VERSUS**                                            **NO. 12-1947**

**N. BURL CAIN, WARDEN**                              **SECTION "A"(2)**

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.  See 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

# I.    STATE COURT PROCEDURAL BACKGROUND[2]

The petitioner, Tyrone Raymond, is incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[3]  On July 6, 2004, Raymond was indicted by a grand jury in St. John the Baptist Parish and charged with the first degree murder of Janice Fugate.[4]  The State amended the indictment on May 20, 2008, to charge Raymond with second degree murder.[5]  The Louisiana Fifth Circuit Court of Appeal summarized the facts of the case as determined at trial as follows:

> On April 23, 2000, at approximately 7:00 a.m., Officer Clay Rauch of the St. John Parish Sheriff's Office was dispatched to Woodland Drive in Laplace regarding a vehicle being parked on a dirt road next to a canal.  Upon arrival, Officer Rauch observed a Chrysler New Yorker vehicle, so he "ran the plates" in order to locate its owner.  The dispatcher informed him that Janice Fugate was the owner of the vehicle and that her address was 2308 Cambridge Drive.  Officers called the residence, but there was no answer, so they went there and knocked on the door.  . . .
> Officer Rauch went to the back door and saw that it was ajar, so he called for backup to search the residence.  When Officer Terrill St. Martin arrived, he noticed a screwdriver lying on the ground next to the back door.  He and Officer Rauch went inside.  There were blood smears on the light switches and walls and bloody shoeprints [sic] throughout the residence.  Officer St. Martin observed that the door of the bedroom had been forced open.  Inside the bedroom, they saw Ms. Fugate on the floor face up with a clear plastic bag over her head and an extension cord wrapped around her neck. Her face and head were bruised and swollen. Additionally, Ms. Fugate's shirt was lifted up, exposing her breasts.

---

[2]Contrary to my briefing order, the State failed to produce copies of the records from the Louisiana Supreme Court and the Louisiana Fifth Circuit Court of Appeal.  Nevertheless, I find that the record is sufficient for the court to address Raymond's petition.

[3]Rec. Doc. No. 5.

[4]St. Rec. Vol. 4 of 9, Indictment, 7/6/04; St. Rec. Vol. 1 of 9, Minutes of Grand Jury Return, 7/6/04.

[5]St. Rec. Vol. 1 of 9, Trial Minutes, 5/20/08; St. Rec. Vol. 5 of 9, Trial Transcript, p. 1083, 5/20/08.

Dr. Fraser Mackenzie performed an autopsy on Ms. Fugate and found that the cause of her death was strangulation by manual and ligature application. He observed that she had a shallow stab wound by her right eye and a deep stab wound in her neck, but neither of those wounds was fatal. During the autopsy, a crime scene technician collected fingernail scrapings from Ms. Fugate's hands.

Natasha Poe, an expert DNA analyst, testified that she compared the right hand fingernail scrapings from Ms. Fugate with known DNA from Ms. Fugate and defendant. In her opinion, it was 2.31 billion times more likely to be a mixture of DNA from Ms. Fugate and defendant than a mixture of DNA from Ms. Fugate and another unknown individual.

Detective Felix Joseph interviewed defendant who denied any involvement in the homicide. Defendant explained that, on the night of April 22nd, he did not go to work. Instead, he claimed that he spent the night at his friend Kelly Roper's house and that he left Ms. Roper's house at 4:30 a.m. to go to Joy's Lounge. According to Detective Joseph, defendant stated that he knew Ms. Fugate, who was his next-door neighbor, but he had only been in her residence a couple of times to help her move furniture.

Detective Joseph interviewed Ms. Roper who initially confirmed defendant's story. However, when he spoke to Ms. Roper a second time, her story changed. Ms. Roper testified that on April 23rd at 11:00 a.m., she was in her front yard sitting on a swing and smoking a cigarette when defendant drove up. He was very sweaty and breathing heavily. Ms. Roper noticed that defendant had a couple of fresh scratch marks on his right arm. When Ms. Roper asked defendant what was wrong, he responded that he had gotten into a confrontation with his neighbor, that it had progressed into a fight, and that he had stabbed, choked, and killed her. Defendant explained that he had done that because he was "getting tired" of her and that she often called the police about him. After confessing to Ms. Roper, defendant stayed in her yard for an hour, and they smoked marijuana. Two weeks later, defendant called Ms. Roper and said he was going to California.

Ms. Roper testified that she lied during her first interview with Detective Joseph because she was scared. She decided to tell the truth the second time because the detectives told her that they would charge her with accessory after the fact if she did not. When Detective Joseph interviewed defendant a second time, defendant changed his story and claimed that he went to work the night of April 22nd and got off at 4:30 a.m., taking Ms. Roper out of the picture completely.

After the State rested its case, defendant's mother, Oradel Henderson, testified that, on April 23rd, when she woke up at 5:30 a.m., defendant was at home. She explained that defendant stayed home that day to take care of his handicapped brother while she and her daughter went to church. She further explained that when she got home from church, defendant was at home.

Defendant testified that, on April 22nd, he got off work at 3:00 a.m. and went home and slept. He woke up and cut his mother's and Ms. Fugate's grass between 11:30 a.m. and 12:00 p.m. Later on, Ms. Fugate gave him some money. He went to Ms. Roper's house at 7:00 p.m. and stayed there until 4:30 a.m. Afterwards,

defendant left and went to Joy's Lounge where he stayed for five or ten minutes, and then he went home at 5:00 a.m. When he arrived, he fell asleep on the floor in his brother's room. Defendant's mother woke him between 7:30 and 8:00 a.m. before she went to church, and he stayed home with his brother the entire day on April 23rd, as his mother did not get home from church until after 6:00 p.m. Defendant testified that he and Ms. Fugate got along well, that she never called the police to complain about him, and that he did not kill her. He denied having scratches on his arm and telling Ms. Roper that he killed Ms. Fugate.

State v. Raymond, 13 So.3d 577, 581-82 (La. App. 5th Cir. 1999); State Record Volume 8 of 9, Louisiana Fifth Circuit Court of Appeal Opinion, 08-KA-1204, pages 2-5, April 28, 2009.

Raymond was tried by a jury on May 20, 21 and 22, 2008, and was found guilty as charged of second degree murder by an eleven (11) to one (1) vote of the jury.[6] On May 29, 2008, the state trial court denied Raymond's motions for post-verdict judgment of acquittal and a new trial.[7] At a hearing on June 26, 2008, the state trial court sentenced Raymond to life in prison at hard labor without benefit of parole, probation or suspension of sentence.[8]

---

[6]St. Rec. Vol. 1 of 9, Trial Minutes, 5/20/08; Trial Minutes, 5/21/08; Trial Minutes (continued), 5/21/08; Trial Minutes, 5/22/08; St. Rec. Vol. 4 of 9, Verdict of the Jury, 5/22/08; Jury Poll, 5/22/08; St. Rec. Vol. 5 of 9, Trial Transcript, 5/20/08; St. Rec. Vol. 6 of 9, Trial Transcript (continued), 5/20/08; Trial Transcript, 5/21/08; St. Rec. Vol. 7 of 9, Trial Transcript (continued), 5/21/08; Trial Transcript, 5/22/08.

[7]St. Rec. Vol. 4 of 9, Motion for Post-Verdict Judgment of Acquittal, 5/28/08; Trial Court Order, 5/29/08; Motion for New Trial, 5/28/08; Trial Court Order (2), 5/29/08.

[8]St. Rec. Vol. 1 of 9, Sentencing Minutes, 6/26/08; St. Rec. Vol. 7 of 9, Sentencing Transcript, p. 1677, 6/26/08; St. Rec. Vol. 4 of 9, Notice of Time to Apply for Post-Conviction Relief, 6/26/08.

4

On direct appeal to the Louisiana Fifth Circuit, Raymond's appointed counsel asserted four (4) errors:[9] (1) The trial court erred in denying the defendant's challenge for cause of jurors Paul Roussel Jr. and Kent Terrio. (2) The trial court erred in granting the State's challenge for cause of juror Donrielle Dennis when there were insufficient grounds to excuse the juror and when the challenge was granted outside defendant's presence. (3) The trial court erred in excusing juror Dynell Cook on the second day of trial. (4) The trial court erred in charging the jury on the crimes of rape, robbery and kidnaping when there was no evidence to support these crimes. Raymond asserted one pro se additional ground, arguing that the trial court erred in accepting the jury's eleven-to-one (11-1) non-unanimous verdict.[10]

The appellate court affirmed the conviction and sentence on April 28, 2010, finding that two of Raymond's arguments were not preserved for appellate review[11] and that all of the claims were otherwise without merit.[12] Raymond sought timely[13] review

---

[9]St. Rec. Vol. 8 of 9, Appeal Brief, 2008-KA-1204, 12/10/08.

[10]State v. Raymond, 13 So.3d at 592; Rec. Doc. No. 5-1, p. 23.

[11]The court determined that Raymond did not base the challenge for cause against juror Roussel on his statement that he would believe a police officer over others and that basis could not be raised for the first time on appeal. State v. Raymond, 13 So.3d at 585. In addition, the court determined that Roussel did not lodge a contemporaneous objection to his absence from the trial court's bench conference with juror Dennis, and the issue was not preserved for appeal. Id., at 588.

[12]State v. Raymond, 13 So.3d at 577; St. Rec. Vol. 8 of 9, 5th Cir. Opinion, 08-KA-1204, 4/28/09.

[13]La. S. Ct. R. X§5 provides that an application must be mailed or filed within 30 days after the appellate court's ruling. The record reflects that Raymond's petition was postmarked during that period.

in the Louisiana Supreme Court, and the court denied his application without stated reasons on February 5, 2010.[14]

Raymond's conviction became final 90 days later, on May 6, 2010, when he did not file a writ application with the United States Supreme Court. Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)), cert. denied, 529 U.S. 1099 (2000); U.S. Sup. Ct. Rule 13(1).

Eight (8) months later, on January 10, 2011, Raymond submitted an application for post-conviction relief to the state trial court in which he asserted five (5) grounds for relief:[15] (1) The state trial court erred in admitting crime lab reports as evidence without an opportunity for Raymond to cross-examine the technicians who authored the reports. (2) The Louisiana State Police Crime Lab was not certified to do DNA testing at the time the evidence was tested. (3) The DNA tests preformed by Natasha Poe were not reliable and the results should not have been admitted into evidence. (4) The evidence was insufficient to support the verdict of second degree murder. (5) He was denied effective assistance of counsel when his counsel failed to (a) subpoena Wayland Brown as an alibi

---

[14]State v. Raymond, 27 So.3d 296 (La. 2010); St. Rec. Vol. 8 of 9, La. S. Ct. Order, 2009-KO-1205, 2/5/10; La. S. Ct. Letter, 2009-KO-1205, 6/2/09 (showing postmark of 5/21/09); Rec. Doc. No. 5-1, p. 50 (dated 5/20/09).

[15]St. Rec. Vol. 8 of 9, Application for Post Conviction Relief, 1/13/11 (dated 1/10/11).

6

witness and (b) request independent testing of the evidence.  Raymond included in his application a request that new DNA testing be conducted on the evidence.[16]

On February 14, 2011, the state trial court denied Raymond's application.  The court held that the first claim was raised at trial but <u>not</u> on direct appeal, and was therefore subject to dismissal under La. Code Crim. P. art. 930.4(C).  The court also noted that Raymond's trial counsel had the opportunity to question Natasha Poe, the laboratory representative, at trial about both reports.  The court determined that Raymond's second claim was factually meritless, finding that the state crime lab had been certified in May 2003, which was before January 7, 2004, when Poe began her DNA analysis.  The court also found no merit in the remaining claims.

The state trial court acknowledged receipt on February 24, 2011, of a supplement to Raymond's application for post-conviction relief which asserted the following grounds for relief:[17] (1) His due process rights were violated when the State orally amended the grand jury indictment on the morning of trial, which led to the trial court confusing the jury with instructions on the definitions of numerous felonies listed in the second degree murder statute, which were not applicable in his case. (2) He was denied a fair trial and

---

[16]St. Rec. Vol. 8 of 9, Application for DNA Testing, 1/13/11 (dated 1/10/11).

[17]St. Rec. Vol. 8 of 9, Supplement to Application (undated); Trial Court's Order, 3/11/11 (showing receipt of supplement on February 24, 2011).

due process for lack of reasonable notice of the charges against him when the indictment failed to include the enumerated felony on which the murder charge was based.

On March 11, 2011, the state trial court denied relief finding the supplemental claims to be without merit and noting that one of the claims had been previously considered on direct appeal.[18]   Raymond moved for reconsideration of the state trial court's order, reurging the request to retest the DNA evidence.[19]   The court appointed counsel and held a hearing on May 4, 2011.[20]   After hearing argument from counsel, the court denied Raymond's application.

In the meantime, Raymond sought review in the Louisiana Fifth Circuit of the denial of his original application and supplemental application for post-conviction relief.[21]   After a brief stay pending a ruling by the trial court, the Louisiana Fifth Circuit reviewed all three post-conviction rulings of the trial court and denied Raymond's application on May 27, 2011.[22]

---

[18]St. Rec. Vol. 8 of 9, Trial Court's Order, 3/11/11.

[19]St. Rec. Vol. 8 of 9, Motion for Rehearing, 2/24/11 (dated 2/22/11).

[20]St. Rec. Vol. 8 of 9, Hearing Minutes, 3/14/11; Hearing Minutes, 4/6/11; Hearing Minutes, 5/4/11.

[21]The State failed to provide and the record does not contain a copy of this writ application. The court's order reflects that it was filed in the Louisiana Fifth Circuit on March 21, 2011. St. Rec. Vol. 8 of 9, 5th Cir. Order, 11-KH-300, 5/27/11; see Rec. Doc. No. 5-2, p. 31.

[22]St. Rec. Vol. 8 of 9, 5th Cir. Order, 11-KH-300, 5/27/11.

8

The appellate court found no error in the state trial court's imposition of the procedural bar to Raymond's claim challenging the admissibility of the crime lab reports. The court also found no error in the state trial court's denial of relief on the claims addressing the reliability of the DNA test, the sufficiency of the evidence and the effective assistance of counsel, all raised in the original application for post-conviction relief. The court found that Raymond's supplemental claim challenging the sufficiency of the grand jury indictment was procedurally barred and otherwise without merit. The court also held that Raymond's other supplemental claim, challenging the oral amendment to the indictment, was without merit.

The appellate court separately addressed Raymond's argument that the trial court erred in instructing the jury on the underlying felonies in the second degree murder statute. Citing La. Code Crim. P. art. 930.4(A), the court recognized that the errors in the trial court's jury instructions had already been addressed on direct appeal and would not be reconsidered on post-conviction review. The court further noted that Raymond's post-conviction pleadings added an argument to the claim that the instructions on the enumerated offenses also placed him in double jeopardy in violation of the Louisiana Constitution. The court found the claim meritless because Raymond was neither punished twice for the same offense nor subject to double jeopardy as a result of being tried on the underlying offenses necessary to prove second degree murder.

Raymond alleges in his federal petition that he thereafter filed a writ application with the Louisiana Supreme Court on June 29, 2011, seeking review of the appellate court's ruling.[23]   No copy of this writ application was provided with the state court record.   On April 9, 2012, the Louisiana Supreme Court denied that writ application without stated reasons.[24]

## II.   FEDERAL HABEAS PETITION

On September 27, 2012, the clerk of this court filed Raymond's petition for federal habeas corpus relief in which he asserts four (4) claims:[25] (1) The state trial court erred in charging the jury on the crimes of rape, robbery and kidnaping in violation of the Sixth and Fourteenth Amendments. (2) The state trial court erred in allowing the crime lab reports to be used as evidence without affording Raymond the right to cross-examine the crime lab technicians in violation of the Sixth Amendment. (3) He was denied his Sixth Amendment right to effective assistance of counsel when counsel failed to (a) subpoena Wayland Brown as an alibi witness and (b) request independent testing of the evidence. (4) The state trial court erred in denying Raymond's challenges for cause for jurors Paul

---

[23]Rec. Doc. No. 5, p. 12; see also, St. Rec. Vol. 8 of 9, La. S. Ct. Letter, 2011-KH-1446, 7/5/11 (showing postmark of 6/30/11).

[24]State ex rel. Raymond v. State, 85 So.3d 134 (La. 2012); St. Rec. Vol. 8 of 9, La. S. Ct. Order, 2011-KH-1446, 4/9/12; La. S. Ct. Letter, 2011-KH-1446, 7/5/11 (showing postmark of 6/30/11).

[25]Rec. Doc. No. 5.

Roussel Jr. and Kent Terrio causing his attorney to have to exercise peremptory exceptions.

The State filed an answer and memorandum in opposition to Raymond's petition, arguing that the petition was untimely filed.[26]   Alternatively, the State argues that Raymond's second claim, challenging admission of the crime lab reports, is procedurally defaulted.   The State also argues that Raymond's third claim, ineffective assistance of counsel, is without merit.   In response to Raymond's first and fourth claims, addressing the jury charges and the denial of challenges for cause, the State adopts by reference the reasons assigned by the Louisiana Fifth Circuit on direct appeal.

III.   <u>GENERAL STANDARDS OF REVIEW</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254.   The AEDPA went into effect on April 24, 1996[27] and applies to habeas petitions filed after that date.   <u>Flanagan v. Johnson</u>, 154 F.3d 196, 198 (5th Cir. 1998) (citing <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997)).   The AEDPA therefore

---

[26]Rec. Doc. Nos. 9, 10.

[27]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. <u>United States v. Sherrod</u>, 964 F.2d 1501, 1505 (5th Cir. 1992).

applies to Raymond's petition, which, for reasons discussed below, is deemed filed in this court on July 25, 2012.[28]

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

The State argues that Raymond's petition is not timely filed and that his claims are in part procedurally defaulted.  As to timeliness, the AEDPA requires a petitioner to bring his Section 2254 petition in most cases within one year of the date his conviction became final.[29]  Duncan v. Walker, 533 U.S. 167, 179-80 (2001).  In this case,

---

[28]The United States Court of Appeals for the Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes.  Coleman v. Johnson, 184 F.3d 398, 401 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995). Raymond's petition was filed by the clerk of court on September 27, 2012, when the filing fee was received after he was denied pauper status.  Raymond's pleadings are marked received by the prison officials on July 25, 2012, when he delivered the pleadings for scanning and e-mailing to the court for filing.  Rec. Doc. No. 5-2, p. 108. The fact that he later paid the filing fee does not alter the application of the federal mailbox rule to his pro se petition. See Cousin v. Lensing, 310 F.3d 843, 843 (5th Cir. 2002) (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing Spotville, 149 F.3d at 374).

[29]The statute of limitations provision of the AEDPA at 28 U.S.C. § 2244(d), provides for other triggers which do not apply here:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of--

A.       the date on which the judgment became final by the conclusion of direct review

Raymond's conviction was final on May 6, 2010.  Thus, under a literal application of the statute, Raymond had one year from the date his conviction became final, or until May 6, 2011, to file his federal habeas corpus petition, which he did not do.  His petition must be dismissed as untimely, unless the one-year statute of limitations period was interrupted or otherwise tolled in either of the following two ways recognized in the applicable law.

First, the United States Supreme Court has held that the one-year statute of limitations period in Section 2244(d)(1) of the AEDPA may be equitably tolled only when the petitioner has pursued his rights diligently and rare or extraordinary circumstances exist which prevented timely filing.  Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005); Fisher v. Johnson, 174 F.3d 710, 713 (5th Cir. 1999), cert. denied, 531 U.S. 1164 (2001); Cantu-Tzin v. Johnson, 162 F.3d 295, 299 (5th Cir. 1998); Davis v. Johnson, 158 F.3d 806, 810 (5th Cir. 1998), cert. denied, 526 U.S. 1074 (1999). Equitable tolling is warranted only in situations where the petitioner was actively misled

---

or the expiration of the time for seeking such review;

B.   the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State actions;

C.   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review;  or

D.   the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

13

or is prevented in some extraordinary way from asserting his rights.  Pace, 544 U.S. at 418-19; Cousin v. Lensing, 310 F.3d 843, 848 (5th Cir. 2002).

Raymond has not asserted any reason that might constitute rare or exceptional circumstances why the one-year period should be considered equitably tolled, and my review of the record reveals none that might fit the restrictive boundaries of "exceptional circumstances" described in binding precedent.  See Holland v. Florida, 130 S. Ct. 2549, 2574-75 (2010) (equitable tolling was warranted where attorney was more than negligent when he failed to satisfy professional standards of care by ignoring the client's requests timely to file a federal petition and in failing to communicate with the client over a period of years in spite of the client's letters); Hardy v. Quarterman, 577 F.3d 596, 599-600 (5th Cir. 2009) (equitable tolling was warranted where petitioner suffered a significant state-created delay when, for nearly one year, the state appeals court failed in its duty under Texas law to inform him that his state habeas petition had been denied, petitioner diligently pursued federal habeas relief, and he persistently inquired to the court.); United States v. Wynn, 292 F.3d 226 (5th Cir. 2002) (tolling warranted when defendant was deceived by attorney into believing that a timely motion to vacate was filed); Coleman v. Johnson, 184 F.3d 398, 402 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000) ("A garden variety claim of excusable neglect does not support equitable tolling."); Fisher v. Johnson, 174 F.3d at 715 (tolling not justified during petitioner's 17-day stay in psychiatric ward, during which he was confined, medicated, separated from his glasses

14

and thus rendered legally blind, and denied meaningful access to the courts); Cantu-Tzin, 162 F.3d at 300 (State's alleged failure to appoint competent habeas counsel did not justify tolling); Davis, 158 F.3d at 808 n.2 (assuming without deciding that equitable tolling was warranted when federal district court three times extended petitioner's deadline to file habeas corpus petition beyond expiration of AEDPA grace period).

In addition to equitable tolling, however, the AEDPA itself provides for interruption of the one-year limitations period, in stating that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2) (emphasis added). By its plain language, this provision does not create a new, full, one-year term within which a federal habeas petition may be filed at the conclusion of state court post-conviction proceedings.  Flanagan, 154 F.3d at 199 n.1.  The Supreme Court has clearly described this provision as a tolling statute.  Duncan, 533 U.S. at 175-178.

The decisions of the Fifth Circuit and other federal courts have held that because this statute is a tolling provision, the time during which state court post-conviction proceedings are pending must merely be subtracted from the one-year limitations period:

> [Section] 2244(d)(2) provides that the period during which a properly filed state habeas application is pending must be excluded when calculating the one[-]year period.  Under the plain language of the statute, any time that passed between the time that [petitioner's] conviction became final and the

time that his state application for habeas corpus was properly filed must be counted against the one[-]year period of limitation.

Flanagan, 154 F.3d at 199 n.1; accord Brisbane v. Beshears, 161 F.3d 1, 1998 WL 609926 at *1 (4th Cir. Aug. 27, 1998) (Table, Text in Westlaw); Gray v. Waters, 26 F. Supp.2d 771, 771-72 (D. Md. 1998).

For a post-conviction application to be considered "properly filed" within the meaning of Section 2244(d)(2), the applicant must "'conform with a state's applicable procedural filing requirements,'" such as timeliness and location of filing. Pace, 544 U.S. at 414 ("When a postconviction application is untimely under state law, 'that [is] the end of the matter' for purposes of § 2244(d)(2)"); Williams v. Cain, 217 F.3d 303, 306-307 & n.4 (5th Cir. 2000) (quoting Villegas v. Johnson, 184 F.3d 467, 469 (5th Cir. 1999)); Smith v. Ward, 209 F.3d 383, 384-85 (5th Cir. 2000). The timeliness consideration in Louisiana, for purposes of the AEDPA, requires application of a prison mailbox rule to state pleadings. Causey v. Cain, 450 F.3d 601, 604-05 (5th Cir. 2006).

A matter is "pending" for Section 2244(d)(2) purposes "as long as the ordinary state collateral review process is 'in continuance.'" Carey v. Saffold, 536 U.S. 214, 219-20 (2002); Williams, 217 F.3d at 310 (a matter is "pending" for Section 2244(d)(2) purposes until "'further appellate review [is] unavailable under [Louisiana's] procedures.'")

16

The phrase "other collateral review" in the statute refers to state court proceedings challenging the pertinent judgment subsequently challenged in the federal habeas petition. Dillworth v. Johnson, 215 F.3d 497, 501 (5th Cir. 2000) (state habeas petition challenging a prior conviction in one county was other collateral review even though filed as a challenge to a second conviction in a different county); Nara v. Frank, No. 99-3364, 2001 WL 995164, at *5 (3rd Cir. Aug. 30, 2001) (motion to withdraw a guilty plea is "other collateral review"). A "pertinent judgment or claim" requires that the state filings for which tolling is sought must have challenged the same conviction being challenged in the federal habeas corpus petition and must have addressed the same substantive claims now being raised in the federal habeas corpus petition. Godfrey v. Dretke, 396 F.3d 681, 686-88 (5th Cir. 2005).

The timeliness calculation contained in the State's response is entirely untrustworthy. First, it is clearly erroneous on two significant grounds. For example, the conviction finality date is incorrect because the State failed to account for the 90-day period provided in Ott, 192 F.3d at 513, for Raymond to have sought review in the United States Supreme Court after the Louisiana courts denied his direct appeal. The State also failed to apply the prison mailbox rule to Raymond's state court pleadings when determining filing dates. See Causey, 450 F.3d at 604-05 (prison mailbox rule applies to Louisiana state court pleadings in determining timeliness under the AEDPA).

17

In addition, no copy of Raymond's 2012 Louisiana Supreme Court writ application appears in the state court record provided to this court in connection with this federal habeas petition.

Raymond clearly filed his writ application with the Louisiana Supreme Court before the AEDPA limitations period lapsed. Although Raymond states that he submitted his application for filing on June 29, 2011, and the pleading was postmarked for mailing to the Louisiana Supreme Court on June 30, 2011 and filed by that court on July 5, 2011, I cannot determine with confidence whether the pleading was in fact properly filed within 30 days after the Louisiana Fifth Circuit issued its ruling on May 27, 2011 as required by Louisiana law.

Given these uncertainties created by the errors in the State's timeliness calculation and the gap in the state court record, I cannot accept the time bar defense. Accordingly, I will address the State's procedural default and merits arguments as to each of Raymond's claims, as appropriate.

IV.   PROCEDURAL DEFAULT (CLAIMS NOS. 2 and 4 in part)

As his second claim asserted in this court, Raymond argues that the state trial court erred in allowing the crime lab reports into evidence without affording him the right to cross-examine the crime lab technician who prepared the reports. Raymond initially asserted this claim in his first state court application for post-conviction relief. On February 14, 2011, the state trial court dismissed the claim pursuant to La. Code Crim.

18

P. art. 930.4(C), because, although Raymond had objected at trial, he did not pursue the issue on direct appeal.[30]  With supporting reasons, the Louisiana First Circuit found no abuse of discretion in the imposition of the bar to review under Article 930.4(C).  This was the last reasoned decision on the issue by a state court.  Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991).

As part of his fourth claim in his federal habeas petition, Raymond argues that the trial court erred in overruling his challenge for cause of juror Paul Roussel, Jr., when Roussel allegedly stated he would give more weight to a police officer's testimony than the testimony of a lay person.  Raymond asserted this argument on direct appeal to the Louisiana First Circuit.  The court found that Raymond had not relied on this basis for his cause challenge in the state trial court. Thus, the argument had not been preserved for appellate review and could not be raised for the first time on appeal.  State v. Browning, 956 So.2d 65, 72 (La. App. 5th Cir. 2007) (holding that the contemporaneous objection rule in La. Code Crim. P. art. 841 limits a party on appeal to the grounds in support of the objection which were articulated in the trial court).  This was the last reasoned opinion on the issue.  Ylst, 501 U.S. at 802.

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both

---

[30]La. Code Crim. P. art. 930.4(C) provides: "If the application alleges a claim which the petitioner raised in the trial court and inexcusably failed to pursue on appeal, the court may deny relief."

independent of the federal claim and adequate to support that judgment.  Coleman v. Thompson, 501 U.S. 722, 731-32 (1991); Glover v. Cain, 128 F.3d 900, 902 (5th Cir. 1997); Amos v. Scott, 61 F.3d 333, 338 (5th Cir. 1995) (citing Harris v. Reed, 489 U.S. 255, 260, 262 (1989)).  This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review.  Amos, 61 F.3d at 338.

Procedural default does not bar federal court review of a federal claim in a habeas petition unless the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar.  Harris, 489 U.S. at 263; Glover, 128 F.3d at 902.

A.   INDEPENDENT AND ADEQUATE

For the state law procedural bar to prevent review by this federal habeas court, the bar must be independent and adequate.  A procedural restriction is "independent" if the state court's judgment "clearly and expressly" indicates that it is independent of federal law and rests solely on a state procedural bar.  Amos, 61 F.3d at 338.  The United States Fifth Circuit has held that "[a] state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a [petitioner's] claim."  Fisher v. Texas, 169 F.3d 295, 300 (5th Cir. 1999).  To be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases.  Walker v. Martin, __U.S.__, 131

20

S. Ct. 1120, 1127 (2011); Glover, 128 F.3d at 902.  A state procedural rule "can be 'firmly established' and 'regularly followed,' - even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." Beard v. Kindler, 558 U.S. 53, __, 130 S. Ct. 612, 618 (2009).  The question of the adequacy of a state procedural bar is itself a federal question.  Beard, 130 S. Ct. at 617 (citing Lee v. Kemna, 534 U.S. 362, 375 (2002)).

La. Code Crim. P. art. 930.4(C) is a clearly independent state law procedural ground for denying review of an improperly raised post-conviction claim.  See Johnson v. Cain, No. 12-0621, 2012 WL 5363327, at *4 (E.D. La. Oct. 30, 2012) (Lemelle, J.) (Article 930.4(C) is an independent state procedural rule); Perez v. Cain, No. 12-1331, 2012 WL 4815611, at *1 (E.D. La. Oct. 10, 2012) (Barbier, J.) (same); Bennett v. Whitley, 41 F.3d 1581 (5th Cir. 1994) (Article 930.4 is independent and adequate basis to federal review); Thomas v. Cain, No. 11-2103, 2012 WL 1885088, at *4 (E.D. La. May 23, 2012) (Lemelle, J.) (same); Washington v. Cain, No. 98-0584, 2000 WL 863980, at *4 (E.D. La. Jun. 27, 2000) (Duplantier, J.) (same).

Louisiana's contemporaneous objection rule under La. Code Crim. P. art. 841, used to bar part of Raymond's challenge to juror Roussel, is also an independent state procedural rule.  Duncan v. Cain, 278 F.3d 537, 541 (5th Cir.) (citing Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977)), cert. denied, 537 U.S. 829 (2002); Bowie v. Cain, 33 F. App'x 705, 2002 WL 432675, at *2 & n.9 (5th Cir. Mar. 7, 2002).  Under La. Code

Crim. Proc. art. 841(A), "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."  Relying on this rule, the Louisiana courts have concluded that  "[a] defendant is limited to the grounds for objection that he articulated in the trial court, and a new basis for the objection may not be raised for the first time on appeal."  State v. Browning, 956 So.2d at 72; State v. Young, 764 So.2d 998, 1005 (La. App. 1st Cir. 2000).  This limitation was applied by the state courts to bar review of Raymond's claim.  The state courts' rulings, therefore, were based on Louisiana law setting forth the procedural requirements for preservation and presentation of claims for appellate review.  See Fisher v. Texas, 169 F.3d at 300 (state courts' clear reliance on state procedural rule is determinative of the issue).

The state courts' reasons for dismissal of Raymond's claims were independent of federal law and relied solely on state procedural rules.  A state procedural bar is presumptively adequate when the state court expressly and regularly relies on it in deciding not to review a claim for collateral relief.  Glover, 128 F.3d at 902.  This is true in Raymond's case.

La. Code Crim. P. art. 930.4(C) is regularly applied by the Louisiana courts and is adequate to bar review of claims that were raised in the trial court and not pursued on direct appeal.  Johnson, 2012 WL 5363327, at *4 (Article 930.4(C) bar is adequate to foreclose federal review); Perez, 2012 WL 4815611, at *6 (same).  The rule is also

adequate to bar review of Raymond's challenge to the admissibility of the crime lab reports.

The Louisiana courts also have relied on the contemporaneous objection rule in La. Code Crim. P. art. 841, and the limitation of grounds to support the objection, to bar claims adding new reasons to challenge a juror that were not raised at trial. State v. Nelson, 39 So.3d 658, 664 (La. App. 5th Cir. 2010) (defendant cannot raise new basis for challenge for cause to dismiss juror that was not raised in the trial court); State v. Mitchell, 7 So.3d 720, 733 (La. App. 5th Cir. 2009) (same). The failure to preserve a claim under La. Code Crim. P. art. 841 also is an adequate state ground which bars review by the federal courts in a habeas corpus proceeding. Duncan, 278 F.3d at 541 (Louisiana's contemporaneous objection rule is an adequate state bar to federal review of a defaulted claims) (citing Wainwright v. Sykes, 433 U.S. at 87-88); see, Toney v. Cain, 24 F.3d 240, 1994 WL 243453, at *2 (5th Cir. May 20, 1994) (Table, Text in Westlaw); Marshall v. Cain, No. 04-219, 2006 WL 2414073, at *1 (E.D. La. Aug. 18, 2006) (Zainey, J.) (Order adopting Report and Recommendation). The procedural bar under La. Code Crim. P. art. 841 is also adequate in this case.

B.    CAUSE AND PREJUDICE

A federal habeas petitioner may be excepted from the procedural default rule only if he can show "cause" for his default and "prejudice attributed thereto," or demonstrate that the federal court's failure to review the defaulted claim will result in a "fundamental

miscarriage of justice."  Glover, 128 F.3d at 902 (citing Coleman, 501 U.S. at 731-32); Amos, 61 F.3d at 338-39 (citing Harris, 489 U.S. at 262; Engle v. Isaac, 456 U.S. 107, 129 (1982)).

To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule.  Murray v. Carrier, 477 U.S. 478, 488 (1986).  The mere fact that petitioner or his counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.  Id., at 486.

In this case, Raymond has not offered any cause for the default which would excuse the procedural bar imposed by the Louisiana courts.  My review of the record does not support a finding that any factor external to the defense prevented Raymond from raising these claims in a procedurally proper manner.  The record reflects no action or inaction by the State which prevented Raymond from properly asserting these claims in the state courts.

"The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown."  Hogue v. Johnson, 131 F.3d 466, 497 (5th Cir. 1997) (citing Engle, 456 U.S. at 134 n.43).  Having failed to show an objective cause for his default, the court need not determine whether prejudice existed,

and petitioner has not alleged any actual prejudice.  Ratcliff v. Estelle, 597 F.2d 474 (5th Cir. 1979) (citing Lumpkin v. Ricketts, 551 F.2d 680, 681-82 (5th Cir. 1977)).

Raymond's claims challenge the admissibility of the crime lab reports and the denial of the challenge for cause based on Roussel's bias in favor of police testimony are therefore procedurally barred from review by this federal habeas corpus court.  See Trest v. Whitley, 94 F.3d 1005, 1008 (5th Cir. 1996) (habeas review precluded when petitioner neglected to allege actual prejudice and cause of failure to comply with state procedural rule concerning time restriction on filing for state post-conviction relief), vacated on other grounds, 522 U.S. 87 (1998).[31]

## C.    FUNDAMENTAL MISCARRIAGE OF JUSTICE

Raymond may avoid this procedural bar only if a fundamental miscarriage of justice will occur if the merits of his claims are not reviewed.  Hogue, 131 F.3d at 497 (citing Sawyer v. Whitley, 505 U.S. 333, 339 (1992)).  To establish a fundamental miscarriage of justice, petitioner must provide this court with evidence that would support a "colorable showing of factual innocence."  Kuhlmann v. Wilson, 477 U.S. 436, 454 (1986); accord Murray, 477 U.S. at 496; Glover, 128 F.3d at 902.  To satisfy the factual innocence standard, petitioner must establish a fair probability that, considering all of the evidence now available, the trier of fact would have entertained a reasonable

---

[31]The Supreme Court vacated the Fifth Circuit's opinion on grounds that a court of appeals is not required to raise the procedural default argument sua sponte. Id.

25

doubt as to the defendant's guilt.  Kuhlmann, 477 U.S. at 454, 455 n.17; Bagwell v. Dretke, 372 F.3d 748, 757 (5th Cir. 2004); Murray v. Quarterman, 234 F. App'x 51, 55 (5th Cir. 2007); see Nobles, 127 F.3d at 423 n. 33 (actual innocence factor requires a showing by clear and convincing evidence that "but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.") When the petitioner has not adequately asserted his actual innocence, his procedural default cannot be excused under the "fundamental miscarriage of justice" exception. Glover, 128 F.3d at 903.

Raymond fails to present any evidence or argument of factual innocence to contravene his conviction.  For these reasons, Raymond has failed to overcome the procedural bar, and his procedurally defaulted claims must be dismissed with prejudice for that reason.

VI.    STANDARDS OF MERITS REVIEW OF THE REMAINING CLAIM

28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings.  Nobles, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28

U.S.C. § 2254(d)(2)), <u>cert. denied</u>, 532 U.S. 1039 (2001).  The amended statute also

codifies the "presumption of correctness" that attaches to state court findings of fact and

the "clear and convincing evidence" burden placed on a petitioner who attempts to

overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and

fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state

court's decision "'was contrary to, or involved an unreasonable application of, clearly

established [Supreme Court precedent.]'" <u>Penry v. Johnson</u>, 215 F.3d 504, 507 (5th Cir.

2000) (quoting <u>Miller v. Johnson</u>, 200 F.3d 274, 280-81 (5th Cir.), <u>cert. denied</u>, 531 U.S.

849 (2000)), <u>aff'd in part, rev'd in part on other grounds</u>, 532 U.S. 782 (2001); <u>Hill</u>, 210

F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1)

standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ
> if the state court arrives at a conclusion opposite to that reached by this
> Court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal principle from
> this Court's decisions but unreasonably applies that principle to the facts
> of the prisoner's case.

<u>Williams v. Taylor</u>, 529 U.S. 362, 405-06, 412-13 (2000); <u>Penry</u>, 532 U.S. at 792-93;

<u>Hill</u>, 210 F.3d at 485.  "'A federal habeas court may not issue the writ simply because

that court concludes in its independent judgment that the state court decision applied [a

Supreme Court case] incorrectly.'" <u>Price v. Vincent</u>, 538 U.S. 634, 641 (2003) (quoting

<u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002)) (brackets in original); <u>Bell v. Cone</u>,

535 U.S. 685, 699 (2002).  Rather, under the "unreasonable application" standard, "the

only question for a federal habeas court is whether the state court's determination is

objectively unreasonable."  <u>Neal v. Puckett</u>, 286 F.3d 230, 246 (5th Cir. 2002), <u>cert.</u>

<u>denied</u>, <u>sub nom</u>, <u>Neal v. Epps</u>, 537 U.S. 1104 (2003). The burden is on the petitioner to

show that the state court applied the precedent to the facts of his case in an objectively

unreasonable manner.  <u>Price</u>, 538 U.S. at 641 (quoting <u>Woodford</u>, 537 U.S. at 24-25);

<u>Wright v. Quarterman</u>, 470 F.3d 581, 585 (5th Cir. 2006).

VII.   <u>JURY INSTRUCTION ON UNRELATED CRIMES (CLAIM NO. 1)</u>

Raymond alleges that the state trial court violated the Sixth and Fourteenth

Amendments when the court included rape, robbery and kidnaping in the definition of

second degree murder and in instructing the jury on each of these felonies as a basis for

the second degree murder charge.  He argues that the State responded to his bill of

particulars by stating it was relying on armed robbery as the underlying felony for the

second degree murder charge.  He further argues that because the evidence at trial did not

establish forcible rape, aggravated rape, first degree robbery or simple robbery, the jury

should not have been instructed on those definitions.  He also contends that the State

agreed that there was no evidence of a kidnaping, yet the state trial court included

aggravated kidnaping and simple kidnaping in the definition of second degree murder.

Raymond's counsel raised this issue on direct appeal.[32]  The Louisiana First Circuit found that, if the trial court erred in charging the jury on the crimes of rape, robbery or kidnaping, the error was harmless under Louisiana law.  The court held that the verdict was not attributable to the harmless error, and there was ample evidence of an aggravated burglary and of Raymond's specific intent to kill or cause great bodily harm in support the guilty verdict.  The Louisiana Supreme Court denied Raymond's subsequent writ application without stated reasons.

The United States Supreme Court has made clear that "instructional errors of state law generally may <u>not</u> form the basis for federal habeas relief."  <u>Gilmore v. Taylor</u>, 508 U.S. 333, 344 (1993); <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991) ("the fact that the instruction was allegedly incorrect under state law is <u>not</u> a basis for habeas relief") (emphasis added). Only if the jury instructions were so unfair as to rise to the level of a constitutional violation would federal habeas relief be appropriate.  <u>Gilmore</u>, 508 U.S. at 343-44; <u>Estelle</u>, 502 U.S. at 72.  To establish a constitutional error arising from the language of a jury charge, a petitioner must prove that the instructions, read as a whole, relieved the State of its burden to prove each element of the crime beyond a reasonable doubt in violation of the due process principles set forth in <u>In re Winship</u>, 397 U.S. 358 (1970).  <u>Estelle</u>, 502 U.S. at 72; <u>Francis v. Franklin</u>, 471 U.S. 307 (1985).

---

[32]Raymond relied on these same arguments to support his state supplemental post-conviction claim challenging the State's amendment to the indictment on the morning of trial. The state trial court denied relief and noted that this argument had already been addressed on direct appeal.

The habeas petitioner must prove <u>both</u> the error <u>and</u> the constitutional violation. <u>Cupp v. Naughten</u>, 414 U.S. 141, 146 (1973). A habeas petitioner bears a particularly heavy burden to establish that the allegedly improper instruction "by itself so infected the entire trial that the resulting conviction violates due process." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977). This is especially so when a petitioner is challenging the constitutionality of a jury instruction that quotes a state statute. <u>Waddington v. Sarausad</u>, 555 U.S. 179, 190 (2009).

The Supreme Court has declared it "well established" that challenged jury instructions "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." <u>Estelle</u>, 502 U.S. at 72 (quoting <u>Cupp</u>, 414 U.S. at 147). "Even if there is some 'ambiguity, inconsistency, or deficiency' in the instruction, such an error does not necessarily constitute a due process violation. <u>Waddington</u>, 555 U.S. at 190 (quoting <u>Middleton v. McNeil</u>, 541 U.S. 433, 437 (2004)). Even an improper instruction warrants habeas relief only where it had a substantial influence on the guilty verdict. <u>Hedgpeth v. Pulido</u>, 555 U.S. 57 (2008) (instructional errors are reviewed for harmlessness under <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)). Under this harmless error standard, the habeas court must consider whether "the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.'" <u>Hedgpeth</u>, 555 U.S. at 58 (quoting <u>Brecht</u>, 507 U.S. at 623); <u>Paredes v. Thaler</u>, 617 F.3d 315, 319 (5th Cir. 2010), <u>cert. denied</u>, 131

S. Ct. 1050 (2011).  Thus, a federal court's inquiry on habeas review is whether any error in giving or failing to give an instruction "by itself so infected the entire trial that the resulting conviction violates due process." (quotations omitted) Waddington, 555 U.S. at 191 (quoting Estelle, 502 U.S. at 72, Cupp, 414 U.S. at 147).

In the instant case, Raymond challenges the state trial court's inclusion of rape, robbery and kidnaping as enumerated felonies in its definition of second degree murder. Raymond bases this claim on the assertion that the trial evidence did not establish that any of these crimes occurred.  As such, the state trial court should not have instructed the jury on these crimes.  Raymond also argues that the State did not identify any of these felonies as a potential basis for his prosecution.

Due process requires a trial court to instruct the jury on a criminal charge that is supported by the evidence.  Hopper v. Evans, 456 U.S. 605, 611 (1982); United States v. Ortego, 859 F.2d 327, 330 (5th Cir. 1988).  On the other hand, due process does not require that a jury be instructed on a charge that is not supported by the evidence. Hopper, 456 U.S. at 611.

In Raymond's case, the state trial court found that instructions on the underlying felonies of rape, robbery and burglary were warranted based on the facts presented to the jury.  This decision is supported by the record.  In addition, the unintended and brief reference to kidnaping in the jury charge was harmless.

To reiterate relevant background, Raymond was charged with first degree murder in the original indictment issued on July 6, 2004.[33]  In connection with that charge, one week later on July 13, 2004, Raymond's counsel filed a motion for a bill of particulars which specifically requested that the State identify which if any of the underlying felonies the first degree murder charge was based.[34]  Of the statutorily enumerated felonies, the State indicated in its answer filed on July 27, 2004, that Raymond was engaged only in an armed robbery.[35]  The State clearly notified Raymond that at least armed robbery was a potential factor in the murder.

Nevertheless, almost four years later, on the morning of the May 20, 2008 trial, the State amended the indictment to reduce the charge against Raymond to second degree murder to avoid the capital requirement of a unanimous verdict.[36]  At trial, the State repeatedly indicated its reliance on other felonies as a basis for the second degree murder charge.  The prosecutor made reference to rape, robbery and burglary throughout the trial as reasonable consequences of the evidence in support of a murder conviction.

---

[33]St. Rec. Vol. 4 of 9, Indictment, 7/6/04.

[34]St. Rec. Vol. 1 of 9, Motion for Bill of Particulars, 7/13/04.

[35]St. Rec. Vol. 1 of 9, Answers to Bill of Particulars, 7/27/04.

[36]St. Rec. Vol. 1 of 9, Trial Minutes, 5/20/08; St. Rev. Vol. 5 of 9, Trial Transcript, p. 1083, 5/20/08.

During voir dire, the prosecutor made two references to underlying felonies which could form the basis of a second degree murder charge. The prosecutor explained the charge to the first panel of prospective jurors as follows:[37]

> Second degree murder is the killing of a human being. And one of, two other elements has (sic) to be present. Either the person that's doing the killing has to have specific intent to kill that person or to cause great bodily harm to that person or if they, even if they don't have the intent to kill if they're involved in any number of crimes at the time. I'm going to give you examples of the kind of crimes we might be talking about. Like an attempted rape, attempted aggravated rape, an armed robbery, an aggravated burglary, or anything of that nature, a very serious crime like that. If any of those crimes are going on at the time, even if you don't intend to kill the person or to cause them great bodily harm, but you do, that's still second degree murder.

The prosecutor made a similar statement to the second panel, referring in that instance only to the crimes of "an attempted or a forcible aggravated [sic] rape or an attempted armed robbery or an aggravated burglary."[38] Raymond's counsel did not object to either of the prosecutor's statements during voir dire.

After the jury was selected and sworn, the state trial court read to the jury the entire second degree murder statute at La. Rev. Stat. §14:30.1(A)(1), (2)(a). In doing so, the court included the statutory reference to "the perpetration or the attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping [sic], second degree kidnapping [sic], aggravated escape, assault

---

[37]St. Rec. Vol. 5 of 9, Trial Transcript, p. 1153-54, 5/20/08.

[38]St. Rec. Vol. 6 of 9, Trial Transcript (continued), p. 1269, 5/20/08.

by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism."[39]  The court advised the jury that "we'll limit that to the appropriate ones later on.  This is just the full range of everything.  Of course you'll get explanations for exactly what they are."[40]

During opening statements, the prosecutor referred to the possible felonies that had to be proven by the State at trial:[41]

> Second Degree Murder is the, is the killing of a human being either with the specific intent to kill or cause great bodily harm or without the intent to kill or cause great bodily harm but committed during an armed robbery, an attempted rape, or a, an aggravated burglary.  . . .  I have to prove that Tyrone Raymond killed Janice Fugate and then I got to prove that Tyrone Raymond either intended to kill her or intended to cause great bodily harm to her; or that when he killed her, whether he, whether he intended to or he didn't intend to, if he was, if he had committed an aggravated burglary or if it was during an armed robbery or an attempted rape of any kind.  . . . Either one of those two things, either those crimes or the intent plus the fact that he did it.

The prosecutor specifically mentioned aggravated burglary, armed robbery and an attempted rape of any kind.  Raymond's counsel did not object to the prosecutor's statement.

---

[39]Id., p. 1322.

[40]Id, pp. 1322-23 (emphasis added).

[41]Id., p. 1331.

During the jury charge conference with the court, the trial judge and counsel reviewed each felony enumerated in the second degree murder statute to determine relevance to the evidence of the case for inclusion in the instructions.[42]   The court decided to instruct the jury only as to "aggravated and forcible rape, aggravated burglary, armed, first degree, second degree, and simple robbery."[43]   Raymond's counsel objected to the inclusion of "the rapes [and] the robberies" as not proven by the evidence.[44]   The court, however, specifically determined that the evidence, including the raised shirt and the rape kit compiled for testing, was enough to give the matter to the jury and for the jury to be instructed on aggravated and forcible rape, aggravated burglary, and/or the referenced robberies, and the attempt to commit these crimes.[45]

Raymond has not established any error in the court's conclusion that the evidence was at least sufficient for the jury to consider whether a rape or attempted rape, a burglary, or an armed robbery had occurred. The jury received testimony and other evidence showing that the 61-year-old victim was found laying on her back with her shirt and bra pulled up to expose her bare breasts and stomach.[46]   The officers found the back

---

[42]St. Rec. Vol. 7 of 9, Trial Transcript (continued), p. 1551 et seq., 5/21/08.

[43]Id., pp. 1557-1558.

[44]Id., p. 1558.

[45]Id., pp. 1554-57.

[46]St. Rec. Vol. 6 of 9, Trial Transcript, p. 1359 (Clay Rauch), p. 1368 (Terrill St. Martin), p. 1379 (Dr. Fraser Mackenzie), p. 1487 (Felix Joseph), 5/21/08.

door to the home forced open, possibly kicked open or opened with the screwdriver found nearby.[47]  The bedroom door was also forced open.[48]  A knife had been used to injure the victim.[49]  She was strangled with an electrical cord, and a plastic bag was placed over her head, most likely after she was dead.[50]  Certain items were missing from the home, which was in disarray.[51]  The victim's car was taken and abandoned at the edge of the neighborhood.[52]  A rape kit was prepared during the autopsy and body fluid samples were obtained from the victim and Raymond for DNA testing.[53]

This evidence was sufficient to prompt the state trial court to instruct the jury on the perpetration or attempted perpetration of aggravated or forcible rape, aggravated burglary and armed, first degree, or second degree robbery, and to allow the jury to consider and decide whether these crimes were proven.

The record is also clear that the intent of the state trial court was to remove all reference to the other enumerated felonies, including aggravated kidnaping and second

---

[47]Id., p. 1359 (Rauch), p. 1366 (St. Martin), pp. 1390-91 (Lt. Harry Troxlair), p. 1486 (Joseph).

[48]Id., pp. 1367, 1369 (St. Martin).

[49]Id., p. 1359 (Rauch), p. 1366 (St. Martin), pp. 1378, 1382 (Dr. Mackenzie), pp. 1392, 1395 (Troxlair), p. 1488 (Joseph).

[50]Id., p. 1359 (Rauch), p. 1367 (St. Martin), pp. 1378-79 (Dr. Mackenzie), p. 1392 (Troxlair), p. 1487 (Joseph).

[51]Id., pp. 1366-68 (St. Martin), pp. 1392, 1395 (Troxlair), pp. 1486-87 (Joseph).

[52]Id., pp. 1358, 1360 (Rauch), pp. 1385-86 (Troxlair).

[53]Id., p. 1379 (Dr. Mackenzie), pp. 1415-17, 1422, 1426-27 (Natasha Poe), pp. 1488, 1490 (Joseph).

degree kidnaping.[54]   The court also meant to tailor the definitions of the underlying felonies to exclude reference to irrelevant elements of each.[55]   The State also limited its closing arguments to address only aggravated burglary, attempted rape, and armed robbery.[56]   At the close of evidence, the state trial court instructed the jury on the definition of second degree murder as the court had directed (over defense counsel's objection to the rape and robbery references):[57]

> Second degree murder is the killing of a human being:
>
> 1)     When the offender has a specific intent to kill or to inflict great bodily harm; or
> 2)     When the offender is engaged in the perpetration of or attempted perpetration of aggravated rape, forcible rape, aggravated burglary, armed robbery, first degree robbery, second degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.

The state trial court went on to explain that, to convict Raymond, the jury would have to find that he killed the victim and that he had specific intent to kill or to inflict great bodily harm upon her.[58]   After explaining the meaning of criminal intent, the court made the following statement:

---

[54]St. Rec. Vol. 7 of 9, Trial Transcript (continued), pp. 1556, 1560, 5/21/08.

[55]Id., pp. 1558-66.

[56]Id., p. 1620.

[57]Id., pp. 1652-53.

[58]Id., p. 1653.

> Okay.  This may sound confusing but the one I just gave was with specific intent, that's part one, this is part two.
>
> Or in order to convict the defendant of second degree murder, you must find:
>
> That the defendant killed the victim while engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated burglary, <u>aggravated kidnapping</u> [sic], <u>second degree kidnapping</u> [sic], armed robbery, first degree robbery, second degree robbery, simple robbery, even though he has no intent to kill or to inflict great bodily harm.

(emphasis added).

The court made no further reference to kidnaping and did not instruct the jury on the meaning of either aggravated or second degree kidnaping.  The court apparently failed to remove this one reference to kidnaping as it had intended to do before instructing the jury.  The inclusion appears to have been an inadvertent clerical error.

The state trial court's unintended reference to aggravated kidnaping and second degree kidnaping was harmless.  The court did not explain these felonies or further instruct the jury on the elements of proof necessary to convict Raymond on these felonies, as the court did with burglary, the rapes and the robberies.  Raymond has not established and the record does not show that the single inadvertent reference infected the trial or had an injurious effect or influence on the jury's verdict.

The jury's guilty verdict was supported by substantial evidence adduced at trial. The evidence established that Raymond had the requisite intent to kill or cause great

bodily harm to the victim, who died as a result of injuries received during the forced entry into her home and bedroom, from which certain items were taken including the car.

As outlined above, the jury heard testimony and saw photographs of the damage done to the victim's back door and bedroom door when the doors were forced open.[59] The victim was beaten and managed to scratch her attacker causing his blood and DNA to remain under her fingernails.[60]  The scrapings from her fingernails overwhelmingly indicated Raymond's DNA and blood.  Raymond still had scratch marks on his arm when he was questioned by police.[61]  The victim was brutally cut and stabbed in the neck and head,[62] then fatally strangled with the electrical cord that was still attached to her VCR.[63] A plastic bag was placed over her head, and she was left with her shirt and bra still pulled up to her shoulders revealing her bare breasts.[64]

The evidence was more than sufficient for the jury to determine that Raymond had the specific intent to kill or cause great bodily harm based on the use of the knife and the

---

[59]St. Rec. Vol. 6 of 9, Trial Transcript, p. 1359 (Rauch), p. 1366, 1367, 1369 (St. Martin), pp. 1390-91 (Lt. Harry Troxlair), p. 1486 (Joseph), 5/21/08.

[60]Id., pp. 1426-27, 1431-36 (Poe), pp. 1488-89 (Joseph).

[61]St. Rec. Vol. 7 of 9, Trial Transcript, pp. 1597-98 (Jackson-rebuttal), 5/22/08.

[62]St. Rec. Vol. 6 of 9, Trial Transcript, pp. 1378, 1382 (Dr. Mackenzie), p. 1488 (Joseph), 5/21/08.

[63]Id., p. 1359 (Rauch), p. 1367 (St. Martin), pp. 1378-79 (Dr. Mackenzie), p. 1392 (Troxlair), p. 1487 (Joseph).

[64]St. Rec. Vol. 6 of 9, Trial Transcript, p. 1359 (Clay Rauch), p. 1368 (Terrill St. Martin), p. 1379 (Dr. Fraser Mackenzie), p. 1487 (Felix Joseph), 5/21/08.

extent of the bodily injury.  State v. Collins, 43 So.3d 244, 251 (La. App. 1st Cir. 2010) (citing State v. Brunet, 674 So.2d 344, 349 (1996)) (Specific intent to kill can be implied by the intentional use of a deadly weapon, such as a knife); State v. Keating, 772 So.2d 740, 743 (La. App. 5th Cir. 2000) (Specific intent may be inferred from the circumstances, the actions of the accused, and the extent and severity of the victim's injuries); Burton v. Terrell, No. 07-0746, 2007 WL 2480468, at *6 (W.D. La. Jul. 19, 2007) (report and recommendation) (Methvin, M.J.) (recognizing Louisiana cases in which specific intent to kill under second degree murder was determined from evidence that defendant strangled the victim to death), adopted by, 2007 WL 6371251, at *1 (W.D. La. Aug. 29, 2007) (Haik, C.D.J.), aff'd, 576 F.3d 268 (5th Cir. 2009).  A reasonable jury could also have found that the forced entry into both the house and the bedroom from which items were missing and the nude victim's body established the perpetration or attempted perpetration of a burglary, rape and/or robbery at the time of her death as defined by the state trial court.[65]

Raymond has not established that the state courts' finding of harmless error and denial of relief on his claim of improper jury instructions were contrary to, or an unreasonable application of, Supreme Court law.  He is not entitled to relief on this issue.

---

[65]St. Rec. Vol. 7 of 9, Trial Transcript, pp. 1654-58, 5/22/08.

## VIII.   INEFFECTIVE ASSISTANCE OF COUNSEL (CLAIM NO. 3)

Raymond alleges that he received ineffective assistance of counsel when his trial counsel failed to (a) subpoena Wayland Brown as an alibi witness to refute Roper's testimony that Raymond committed the murder and (b) have the evidence independently tested.

Raymond asserted this claim in his application for post-conviction relief, which was denied by the trial court as meritless under the standards of Strickland v. Washington, 466 U.S. 688 (1984), and related state law.  The court resolved that the decisions not to call Brown to give cumulative alibi testimony was trial strategy and that the decision not to test the evidence was strategic, since any testing may have located Raymond's DNA on the other bloody evidence.  The Louisiana First Circuit also denied relief, finding that, assuming counsel knew about Brown, the alleged alibi witness, his testimony would have been cumulative.  The court also determined that Raymond's arguments about the testing of evidence were conclusory and that he failed to prove that any additional testing would have established his innocence.  This was the last reasoned opinion on the issue.

The issue of ineffective assistance of counsel is a mixed question of law and fact. Clark v. Thaler, 673 F.3d 410, 416 (5th Cir. 2012); Woodfox v. Cain, 609 F.3d 774, 789 (5th Cir. 2010).  Thus, the question before this court is whether the state courts' denial

41

of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

As indicated by the state courts, the standard for judging performance of counsel was established by the United States Supreme Court in Strickland, in which the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice. Strickland, 466 U.S. at 697. The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. Kimler, 167 F.3d at 893. A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' . . . But it is not enough under Strickland, 'that the errors had some conceivable effect on the outcome of the proceeding.'" (citation omitted) Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994) (quoting Strickland, 466 U.S. at 693); Harrington v. Richter, __ U.S. __, 131 S. Ct. 770,

42

792 (2011) (<u>Strickland</u> requires a "substantial" likelihood of a different result, not just "conceivable" one.)

On federal habeas review, scrutiny of counsel's performance "must be highly deferential," and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." <u>Moore v. Johnson</u>, 194 F.3d 586, 591 (5th Cir. 1999) (citing <u>Strickland</u>, 466 U.S. at 689-90). In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. <u>Strickland</u>, 466 U.S. at 689; <u>Neal v. Puckett</u>, 286 F.3d at 236-37; <u>Clark v. Johnson</u>, 227 F.3d 273, 282-83 (5th Cir. 2000), <u>cert. denied</u>, 531 U.S. 1167 (2001).

On habeas review, the United States Supreme Court has recently clarified that, under <u>Strickland</u>, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." <u>Harrington</u>, 131 S.Ct. at 788. The <u>Harrington</u> Court went on to recognize the high level of deference owed to a state court's findings under <u>Strickland</u> in light of the AEDPA:

> The standards created by <u>Strickland</u> and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is doubly so. The <u>Strickland</u> standard is a general one, so the range of reasonable applications

43

is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

<u>Harrington</u>, 131 S. Ct. at 788.

Thus, scrutiny of counsel's performance under § 2254(d) is "doubly deferential." <u>Cullen v. Pinholster</u>, __ U.S. __, 131 S. Ct. 1388, 1403 (2011) (quoting <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009)).  This court must therefore apply the "strong presumption" that counsel's strategy and defense tactics fall "within the wide range of reasonable professional assistance."  <u>Strickland</u>, 466 U.S. at 690.  Federal courts have consistently recognized that tactical decisions when supported by the circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance. <u>Lamb v. Johnson</u>, 179 F.3d 352, 358 (5th Cir. 1999), <u>cert. denied</u>, 528 U.S. 1013 (1999) (citing <u>Rector v. Johnson</u>, 120 F.3d 551, 564 (5th Cir. 1997) and <u>Mann v. Scott</u>, 41 F.3d 968, 983-84 (5th Cir. 1994)).  Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise.  <u>Strickland</u>, 466 U.S. at 689; <u>Moore</u>, 194 F.3d at 591.  The burden is on petitioner to demonstrate that counsel's strategy was constitutionally deficient.  <u>Id</u>.

A.    FAILURE TO CALL BROWN AS A WITNESS

Raymond argues that he was denied effective assistance of counsel when his counsel failed to call Brown as an alibi witness to refute Roper's trial testimony.  On federal habeas corpus review, "'[c]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.'"  Graves v. Cockrell, 351 F.3d 143, 156 (5th Cir. 2003) (quoting Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978)).   "'Failure to present [evidence does] not constitute 'deficient' performance within the meaning of Strickland if [counsel] could have concluded, for tactical reasons, that attempting to present such evidence would be unwise.'" (brackets in original) Williams v. Cockrell, 31 F. App'x 832, 2002 WL 180359, at *3 (5th Cir. Jan. 4, 2002) (quoting Williams v. Cain, 125 F.3d 269, 278 (5th Cir. 1997)).

As found by the state courts, Raymond's arguments in support of this claim are conclusory and vague. Assuming he proposed to counsel that Brown be called as a witness, Raymond has not specified or provided proof as to what Brown would have testified.  Instead, he merely speculates, without evidence, that Brown would have supported his alibi defense to refute Roper's testimony that implicated Raymond in the murder.  This is not enough to establish that his counsel's actions were deficient or that he was prejudiced.

According to Raymond's trial testimony, which differed from his prior statements to police, on the night before the body was found, he went to Roper's house at 7:00 p.m. where he stayed until 4:30 a.m., when he left to go to a bar for a few minutes before heading home at 5:00 a.m. to sleep.  Counsel called Raymond's mother to corroborate Raymond's story.  She testified that Raymond was at home asleep in his brother's room when she awoke around 5:30 a.m.  She also testified that she woke Raymond around 7:30 a.m. when she left for church.  In light of her testimony, it would have been reasonable for counsel to decide not to call another alibi witness to establish or corroborate the same facts.

Having failed to prove what Brown would have said, Raymond has not established that counsel's decision was unreasonable or that he was prejudiced by counsel's decision not to call Brown as a cumulative alibi witness.  As Raymond argues, the State's case hinged on connecting him to the crime beyond the DNA evidence.  In light of this, counsel's decision not to call a witness who may have testified differently than anticipated or whose testimony would have been cumulative was a sound strategic decision.  Lema v. United States, 987 F.2d 48, 54 (1st Cir. 1993) (citations omitted) ("Where the prosecution's case is less than compelling . . ., the risk of 'rocking the boat' may warrant a decision by trial counsel to forego the presentation of further defense testimony, even favorable testimony.")

The fact that defense counsel's trial strategy was not successful, i.e. that Raymond was ultimately convicted, does not mean that his actions were deficient. See Martinez v. Dretke, 99 F. App'x 538, 543 (5th Cir. 2004) ("Again, an unsuccessful strategy does not necessarily indicate constitutionally deficient counsel."). "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689 (citations omitted). Raymond has provided no basis to undermine the deference due his counsel's trial tactics and strategy.

Raymond has not established that his counsel was deficient or prejudicial in failing to call Brown as a witness. The state courts' denial of relief on this issue was not contrary to or an unreasonable application of Strickland. He is not entitled to relief on this claim.

B.      FAILURE TO HAVE EVIDENCE INDEPENDENTLY TESTED

Raymond also alleges that his counsel provided ineffective assistance when he failed to request independent testing of the evidence. Raymond claims that, in addition to contaminated DNA evidence that was tested, there were 43 pieces of evidence that were not tested by the crime laboratory, including the bloody socks that were worn by the perpetrator on his hands during the crime. He also argues that counsel had an evaluation showing that the technical work of lab technician Natasha Poe was sloppy.

He argues that, in light of these considerations, counsel should have had all of the evidence tested independently to prove his innocence.

Raymond asserted this claim on post-conviction review and the state trial court denied relief. The court held that there was no requirement that counsel have the evidence tested, and the decision not to test the evidence was sound trial strategy in light of the real possibility that the evidence may have contained Raymond's DNA. The Louisiana First Circuit also denied relief, finding that Raymond's claim that the evidence would have proven his innocence was speculative, conclusory and insufficient to establish ineffective assistance. This was the last reasoned decision on the issue.

As concluded by the state courts, Raymond has not established that testing of the evidence would have proven anything favorable to the defense. His claim is wholly speculative. In addition, contrary to his suggestions, Raymond's prior counsel did in fact attempt to preserve the evidence for retesting and challenged the testing procedures and results several times during the proceedings.

The record reflects that on September 7, 2006, the state trial court held a pretrial hearing on the motion filed by Raymond's previous counsel under La. Code Crim. P. art. 719(B) to preserve bodily substances taken from Raymond pursuant to a court order. Counsel representing Raymond at the hearing stated that prior counsel had filed the motion to prevent DNA testing by the State, because the testing would use up the evidence "and there would not be any to be tested independently by an expert for the

Defense."[66]  Natasha Poe testified at the hearing that certain evidence items were tested

for DNA:[67]

> Our lab is [sic] tested the reference blood from Janice Fugate [the victim].
> A cotton swatch from a vehicle driver's armrest.  Various cotton swatches
> from VCR.  Reference blood from a Tyrone Raymond.  Various hairs that
> reflected from a sock.  A fingernail collected from a shirt.  Some shirts with
> some hairs on it.  Sock with hairs on it.  A plastic bottle containing a piece
> of aluminum foil and a straw fingernail scrapping [sic] from Janice Fugate.

Poe testified that the fingernail scrapings and the fingernail from the shirt were

consumed in the DNA testing done at the lab, leaving the original packaging it had been

in and the DNA extract, or liquid form of the scrapings left after testing was completed.[68]

The scrapings sample and the fingernail were consumed in testing with the written

permission of an assistant district attorney.[69]

Poe also indicated that the lab tested other items for serology, or the presence of

body fluids, as a preliminary test before DNA testing. These items were a light switch

cover from the kitchen wall, a light switch cover from the living room hallway, a chef's

knife, two other knives, a sex crimes kit, and various swatches containing blood from the

---

[66]St. Rec. Vol. 4 of 9, Hearing Transcript, p. 4, 9/7/06.  The motion was filed by attorney Jeff
Hand and Raymond was represented at the hearing by Frank Larré.

[67]Id., p. 7.

[68]Id., pp. 9, 11-12.

[69]Id., pp. 10, 11-12; see also, St. Rec. Vol. 5 of 9, Hearing Transcript, p. 34, 5/7/08.  Permission
was granted by First Assistant District Attorney G. Charles Lorio, Jr.

crime scene.[70]  These items did not test positive for serology and for that reason were not tested for DNA.

After hearing this testimony, Raymond's counsel complained to the court that the State had authorized consumption of the fingernail evidence without the defense's consent.  The court determined, however, that the motion was limited to retention of the samples obtained from Raymond and did not address the DNA samples generally.[71]  The court nevertheless granted the motion to preserve the DNA samples taken from Raymond after his arrest.

The state trial court later held a hearing on May 7, 2008, to consider a defense motion to determine the admissibility of the DNA evidence at which Raymond was represented by a different attorney.[72]  Poe again testified about the testing procedures and results related to the fingernail scrapings.[73]  The DNA testing showed the scrapings contained a mixture of DNA from both Raymond and the victim, Fugate, and it was "two

---

[70]Id., p. 8.

[71]Id., pp. 14-15; St. Rec. Vol. 5 of 9, Hearing Transcript (continued), pp. 16-18, 9/7/06.

[72]St. Rec. Vol. 5 of 9, Hearing Transcript, 5/7/08 (Raymond was represented by attorney Lantz Savage); see also, Hearing Transcript, 1/9/08 (Raymond was represented by attorney Shantel Octave).

[73]Id., p. 24.

point three one billion times more likely to be a mixture of these two people versus being a mixture from Janice Fugate and some unknown unrelated individual."[74]

Poe testified that the results initially indicated that the sample extract was contaminated during the process.  However, "the sample was rectified when it was amplified and the controls performed the way they should" which resulted in the DNA match to Fugate and Raymond.[75]  The state trial court deemed the testing reliable and the evidence admissible by judgment issued May 12, 2008.[76]

These pretrial proceedings indicate that all of Raymond's attorneys were concerned with and addressed the preservation of the DNA evidence and the testing of the other evidence taken from Fugate's home and car.  The record is clear that before the hearing in 2006, the fingernail scrapings and the fingernail fragment had been consumed in the testing done by the crime laboratory before that date.  In fact, one of Raymond's attorneys was so concerned with the testing that an independent expert opinion was pursued before trial.

The record contains the report of Amber Moss, forensics supervisor at Orchid Cellmark, addressing the process and results of the DNA testing done by the crime

---

[74]Id., p. 31.

[75]Id., pp. 50-51, 53.

[76]St. Rec. Vol. 4 of 9, Trial Court Judgment, 5/12/08.

laboratory.[77]  In that report, Moss indicates various concerns with the testing process, the same concerns and contaminations used by Raymond's counsel to question Poe at trial. Moss also indicated that there was nothing to be tested by an independent lab.

Considering this report and the record, there was nothing of the scrapings and fingernails to be tested.  Raymond's counsel could not have sought retesting of something that did not exist, and no constitutionally ineffective assistance of counsel can result from this circumstance.

In addition, the record also reflects that, contrary to Raymond's argument, all of the evidence was tested for serology to determine the presence of human fluids as a precursor to DNA testing.  Poe testified before and at trial that the DNA testing was only done on the items that tested positive for serology, which included the fingernail scrapings, the fingernail fragment and the other items listed by her in 2006.  She also testified that there was no basis for testing the other evidence items that did not test positive in the serology test, items she also listed in her 2006 pretrial testimony.

Thus, contrary to Raymond's contention, all of the swatches and items retrieved from the house and car were tested, even if only for serology, which according to Poe was a necessary factor to warrant further DNA testing.  He has presented nothing to challenge Poe's statement in this regard.  Of the ones tested further for DNA, only the

---

[77]St. Rec. Vol. 8 of 9, DNA Expert Report, 5/5/08.

fingernail scrapings provided DNA results and those results overwhelmingly matched Raymond and Fugate.

Thus, the record indicates that counsel could not have the fingernail scrapings or the fingernail fragment retested since they had been consumed.  In addition, there was nothing in the record or the pretrial hearings which would have prompted counsel to have the other evidence items retested.  The other items either had no indicators for the presence of any human fluids or did not provide any DNA information when the body serum was tested.  The boundaries of reason would not require counsel to pursue testing on items that did not contain or present anything to be tested.

As a strategic matter, counsel was able to use the non-existence of any other forensic connection to argue to the jury that Raymond did not commit the murder.  Trial counsel introduced testimony from which the jury could have found that the DNA under her fingernails was coincidental because of Raymond's presence in and around her home at other times.  As noted by the state appellate court, any additional testing, perhaps with more sophisticated methods or expert technicians, may have done nothing more than to locate more condemning DNA evidence against Raymond. As a strategic or tactical matter, counsel was not in a position to risk that result.

Based on the record, Raymond has not established that any of his attorneys, much less trial counsel, were deficient in failing to pursue additional testing of the evidence. He has offered nothing other than speculation to establish that more testing would have

altered the verdict or otherwise exculpated him.  As such, the state courts' denial of relief was not contrary to or an unreasonable application of <u>Strickland</u>.  Raymond is not entitled to relief on this claim.

## IX.    <u>DENIAL OF JUROR CHALLENGES FOR CAUSE (CLAIM NO. 4)</u>

Raymond also alleges that the state trial court erred in denying his counsel's challenges for cause against potential jurors Paul Roussel, Jr., who knew a defense attorney, an assistant district attorney and two of the investigators, and Kent Terrio, who felt that Raymond should have to testify at trial.  Raymond argues that these potential jurors expressed partiality and should have been removed for cause, rather than forcing his counsel to use a peremptory challenge.

Raymond's appointed counsel asserted these arguments on direct appeal.  The Louisiana First Circuit found no error in the trial court's denial of the challenge for cause against Roussel, finding that his answers as a whole did not demonstrate that he would be partial. The court also found no error with respect to Terrio because he was adequately rehabilitated after further questioning, and he indicated his willingness to decide the case impartially.  This was the last reasoned opinion on the issue.

The Due Process Clause guarantees an accused the Sixth Amendment right to an impartial jury that will determine guilt based on the evidence and the law as instructed, rather than on preconceived notions or extraneous information.  <u>Morgan v. Illinois</u>, 504 U.S. 719, 726-27 (1992); <u>Patton v. Yount</u>, 467 U.S. 1025, 1037 & n.12 (1984).

54

Construed broadly, Raymond's claims are that he was denied a fair and impartial jury because the state trial court denied his challenges for cause to exclude Roussel and Terrio, which forced his counsel to use peremptory challenges to exclude them.

As an initial matter, the Supreme Court has "reject[ed] the notion that the loss of peremptory challenges constitutes a violation of the constitutional right to an impartial jury." <u>Ross v. Oklahoma</u>, 487 U.S. 81, 88 (1988).  Instead, after the denial of a challenge for cause, when the challenged juror is removed by use of a peremptory challenge, the petitioner is entitled to federal habeas corpus relief <u>only</u> if he demonstrates that the jury ultimately selected to try the case was not impartial.  <u>Ross</u>, 487 U.S. at 85-86, 88-89; <u>Rivera v. Illinois</u>, 556 U.S. 148, 158-59 (2009); <u>Soria v. Johnson</u>, 207 F.3d 232, 241 (5th Cir. 2000); <u>Williams v. Cockrell</u>, 46 F. App'x 227, 2002 WL 1940099, *5-*6 (5th Cir. Jul. 25, 2002).  "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." <u>Ross</u>, 487 U.S. at 88.

Raymond does not allege or establish that the jury ultimately selected to preside over his trial was anything other than impartial.  He only complains that his counsel had to use a peremptory challenge to exclude jurors that should have been dismissed for cause.  His claim based on this theory alone fails to state a basis for federal habeas relief. <u>Soria</u>, 207 F.3d at 241-42; <u>Dorsey v. Quarterman</u>, 494 F.3d 527, 533 (5th Cir. 2007); <u>Lagrone v. Cockrell</u>, No. 02-10976, 2003 WL 22327519, at *12 (5th Cir. Sep. 2, 2003).

As for the denial of the challenge for cause itself, "refusal to grant a challenge for cause is within the discretion of the trial court, and it does not provide a basis for habeas corpus relief unless the disqualifying fact was so prejudicial that the refusal deprived the petitioner of a fundamentally fair trial." Sudds v. Maggio, 696 F.2d 415, 416 (5th Cir. 1983). "The standard for determining when a venire member may be excluded for cause is whether the prospective juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Soria, 207 F.3d at 242 (quoting Wainwright v. Witt, 469 U.S. 412, 424 (1985)). A juror is considered biased if he unequivocally states during voir dire that he cannot be fair and impartial. Virgil v. Dretke, 446 F.3d 598, 613 (5th Cir. 2006). A trial judge should normally undertake an assessment of any bias by questioning the juror directly, with the participation and input of counsel. See Smith v. Phillips, 455 U.S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."); Hatten v. Quarterman, 570 F.3d 595, 600 (5th Cir. 2009).

Thus, implicit in a state court's denial of a challenge for cause is a finding that the juror was not biased. Jones v. Butler, 864 F.2d 348, 362 (5th Cir. 1988); Miniel v. Cockrell, 339 F.3d 331, 338-39 (5th Cir. 2003) (citing Jones); Montoya v. Scott, 65 F.3d 405, 419 n.29 (5th Cir. 1995); see also Fuller v. Johnson, 114 F.3d 491, 500-01 (5th Cir.

1997).  The United States Supreme Court has made clear that "deference must be paid to the trial judge who sees and hears the juror."  Wainwright v. Witt, 469 U.S. at 426.

Furthermore, the state court finding of non-bias is a factual one that is accorded the "presumption of correctness" under 28 U.S.C. § 2254(d).  Williams v. Cockrell, 2002 WL 1940099, at *7 (citing Jones, 864 F.2d at 362).  The state trial court's finding of juror impartiality is entitled to a presumption of correctness.  Oliver v. Quarterman, 541 F.3d 329, 342 (5th Cir. 2008); Jones, 864 F.2d at 362 (quoting pre-AEDPA 28 U.S.C. § 2254(d)(8)).

In this instance, Raymond asserts that the state trial court erred in denying his trial counsel's challenges for cause against Roussel and Terrio because of their alleged biases.  For the following reasons, the record fully supports the state courts' finding that neither juror was biased to support the challenge for cause.

A.   Paul Roussel, Jr.

Roussel was a member of the first panel of potential jurors.  During voir dire, the state trial court asked the panel if they knew the defense attorneys or the prosecutor and his two investigators.[78]  Roussel, among many others, responded that he knew assistant district attorney William O'Regan, the investigator Stephen Cupit, and one of the defense

---

[78]St. Rec. Vol. 5 of 9, Trial Transcript, p. 1126, 5/20/08.

attorneys, Tommy Acosta.[79]  The court asked if his acquaintance or association with these people would affect his decision in the trial.[80] Roussel answered, "I would think it would, I mean, somebody you know."  Immediately following his comment, the court made the following statement to the entire panel:

> Well, I'm asking you, this is a small community, everybody knows somebody in some, in some manner, in some fashion, but is your relationship or your knowledge of these people so strong that you can't treat both sides fairly?  That's what I need to know.
> So those of you who can't, who wanted to see me privately, come up here.

Roussel did not respond to the court's request to approach the bench to declare an inability to be fair.[81]

In later questioning by the prosecutor, Roussel affirmed that he could decide the case without sympathy influencing his vote.[82]  Defense counsel, Lantz Savage, questioned Roussel about his relationship with the district attorney and the investigators.[83]  Although counsel did not mention him, Roussel responded first that his daughter went to school with Acosta, the other defense attorney, whom he had known for

---

[79]Id., p. 1127.

[80]Id., pp. 1128-29.

[81]The court and counsel spoke privately at the bench with three other jurors, one who was pregnant but could be fair, one who was disappointed with the district attorney's office and could not be fair, and one who professed a relationship with the defendant and could not be fair.  Id., pp. 1130-35.

[82]Id., p. 1167.

[83]Id., p. 1174.

years.  Roussel also indicated that he and the investigator, Cupit, both had season football

tickets for LSU and that he coached Cupit's daughter in softball.  He also stated that he

had played ball with O'Regan when they were young.  Savage then asked Roussel if his

"relationship with . . . Cupit and . . . Acosta [would] affect your decision in any way for

. . . Raymond's benefit or against the State?"[84]  The following exchange occurred:[85]

> MR. ROUSSEL:    That's hard to say.  I mean, it plays on your mind, you
> know.  When you're hearing something from someone you know I think
> that bears more weight than from somebody you don't.
>
> MR. SAVAGE:    So you're saying it may, it may influence your
> decision?
>
> MR. ROUSSEL:    I would think it's definitely in my mind.

Roussel did not respond to the court's general question to the panel about the

jurors' ability to apply the law as instructed, to require the State to meet its burden of

proof, or to vote guilty if the State did so.[86]  Roussel also did not respond to the court's

question to the panel as to whether anyone had any reason why they could not be fair to

both sides.[87]

Defense counsel Savage later challenged Roussel for cause based on his statement

that his knowledge of Acosta, the prosecutor and the investigators would "pray on his

---

[84]Id., p. 1175.

[85]Id., p. 1175-76.

[86]Id., p. 1150-52.

[87]Id., p. 1152.

mind."[88]   Savage acknowledged that Roussel "never said that he would be more fair

to . . . Acosta or more fair to the D.A. but he kept saying it would influence his decision,

it would pray on his mind, and it's something he had to think about."   In response

O'Regan noted that Roussel never said that he could not be fair.   He also argued that

Roussel was not specifically asked if he could be fair or whether he would be influenced

by one side or the other.[89]   The state trial court agreed with O'Regan and denied the

challenge for cause based on the following:[90]

> I think he was being very candid and said because of who he knew it might
> play on his mind, he didn't say pray, he said play on his mind.  And we all
> know, of course, that that's going to, to play some role but it's not worthy
> of a challenge for cause.

Defense counsel eventually used a peremptory challenge to exclude Roussel from the

jury.[91]

In denying the challenge for cause, the state trial court assessed Roussel's

credibility and considered the totality of his responses to find that Roussel had not

indicated or demonstrated an inability to be fair.   This finding was given deference and

affirmed by the Louisiana Fifth Circuit on direct appeal.

---

[88]Id., p. 1207.

[89]Id.

[90]Id., p. 1207-08.

[91]Id., p. 1208.

I find that the state courts' conclusion is supported by the record. Roussel knew people on both sides of the case. He did not indicate that he could not be fair to one or the other side. He also did not declare an inability to follow the law, require the State to meet its burden or find the defendant guilty if the State sustained its burden. The trial court found his ability to be fair evident from his candid statements, and the record supports that decision. Raymond has not demonstrated that Roussel had "such fixed opinions that [he] could not judge impartially the guilt of the defendant." Chavez v. Cockrell, 310 F.3d 805, 811 (5th Cir. 2002).

Under the federal standards outlined above, the factual finding of fairness and the denial of the challenge for cause by the state trial court were supported by the record and are entitled to deference. The state courts' denial of relief was not contrary to, or an unreasonable application of, Supreme Court law. Raymond is not entitled to relief on this claim.

B.    Kent Terrio

Terrio was a member of the second panel of potential jurors. As with the first panel, the state trial court asked the prospective jurors questions about their relationships, if any, with counsel, the involved parties and any relatives in law enforcement.[92] Terrio did not respond to these questions. The court received no response from the panel when it asked if anyone would treat law enforcement personnel or their testimony differently

---

[92]Id., pp. 1245-50; St. Rec. Vol. 6 of 9, Trial Transcript (continued), p. 1251, 5/20/08.

from that of any other witness.[93]  No potential juror responded when the court inquired

about their ability to apply the law as instructed, to require the State to meet its burden

of proof, or to vote guilty if the State did so.[94]

The court then asked whether, if the defendant did not take the stand, any of the

jurors would hold it against him.  Terrio responded, "I, I have a problem with that," as

did another juror, Tracy Bosarge.[95]  The following exchange occurred:[96]

> THE COURT:      Okay.  But, wait, let me, okay, before you say
> something.  You may have a natural inclination to want to hear from the
> defendant but do you understand there are reasons where he may be
> advised not to take the stand and it is his right not to take the stand?  If I tell
> you that's the law, whether you like it or not, are you going to follow it?
> Mr. Terrio?
>
> MR. TERRIO:      I mean, if it happens while I'm on the jury it's going to
> put in my mind he's, he's going towards the guilty side to me.  That's me.
>
> THE COURT:      Just because he doesn't take the stand?
>
> MR. TERRIO:      Right.  Because - -
>
> THE COURT:      Okay.
>
> MR. BOSARGE:    That's the way I feel.  If you don't want him to speak
> a word you've got something to hide.  That's the way I feel.  Be in the back
> of my mind that he's hiding something.

---

[93]St. Rec. Vol. 6 of 9, Trial Transcript (continued), p. 1251, 5/20/08.

[94]Id., p. 1263-64.

[95]Id., p. 1265; St. Rec. Vol. 5 of 9, Trial Transcript, p. 1224, 5/20/08 (full name of Bosarge).

[96]Id., pp. 1265-66.

THE COURT:        Anybody else?
(No response)

THE COURT:        So, in other words, you two gentleman cannot follow the law as I give it to you then?  Is that, is that what you're saying?

MR. BOSARGE:    I guess not.

THE COURT:        Okay.

MR. TERRIO:       I guess.

The district attorney later questioned Terrio about his ability to follow the law as

he would be instructed, specifically with regard to the defendant's right not to testify.[97]

MR. O'REGAN:     Mr. Terrio, would you consider yourself to be a law abiding citizen?

MR. TERRIO:       Yes.

MR. O'REGAN:     Okay.  So, so you don't have a problem with following the laws of the state of Louisiana?

MR. TERRIO:       Looks like I do for one.

MR. O'REGAN:     Okay.  So you can't follow that law, you cannot, you cannot - -

MR. TERRIO:       I'm not saying I'm not going to follow it but it's going to put in my mind more on the guilty side if he doesn't take the stand. That's all I'm saying, I mean.

MR. O'REGAN:     All, I mean, what we, what we're asking of a juror is to just be, to listen to the evidence as put on - -

MR. TERRIO:       And I would.

_____

[97]Id., p. 1269-72.

MR. O'REGAN:   - - and make a decision based solely on the evidence and not take into consideration anything else, just what they hear from the stand.  And, and, and one of the laws that we have is that you don't have to testify.  I mean, that's one of the oldest laws that came over - -

MR. TERRIO:   That's the first time I heard it.

[. . .]

MR. O'REGAN:   [. . .] And, you know, basically what we're asking is you, even though you may want to hear what a defendant has to say, that you can mentally just say, okay, I'm going to put this out of my mind, I'm not going to take that into consideration, I'm just going to decide the case on the evidence.  Can you do that?

MR. TERRIO:   I'm not saying, if he doesn't take the stand I'm not saying I'm going to convict him because of that.

MR. O'REGAN:   Hmm hmm.

MR. TERRIO:   But I'm just saying it would put a little, like you said, in my mind, why are you not taking the stand.  You going to get prison if you get found guilty.  If you innocent why not take the stand and say what you got to say?

MR. O'REGAN:   Well, I mean, I know that's, that's, I mean, it's just human curiosity.  Okay?  And what I'm asking you is that can you put aside your normal human curiosity and, and not let that affect your decision?

MR. TERRIO:   It's going to be on my mind.  If I hear the evidence I'm going to take the evidence into consideration.

The district attorney later re-focused on Terrio by asking him if he could accept the fact that the burden of proof was "completely on me."[98]  Terrio indicated that he

---

[98]Id., p. 1277.

could accept it, but indicated that if he were being accused of a crime, he would shout his

innocence from the roof-top.  O'Regan asked him again, "You understand that sometimes

people don't take the stand because their lawyer tells them not to or because there are

other considerations, you know, that maybe not having anything really directly to do with

the case that . . . they don't want to be called upon on the stand for."[99]  Terrio responded,

"Sure, I guess that is possible."[100]

Following voir dire by defense counsel, the state trial court asked follow-up

questions to Terrio:[101]

> THE COURT:       Mr. Terrio, to [sic] spite your, your inclination to want
> to hear what the defendant has to say, if I tell you he doesn't have to take
> the stand and that's the law, you're becoming a judge now, okay, you're the
> judge, are you going to follow the law whether you agree with it or not?
>
> MR. TERRIO:       Yes.
>
> THE COURT:       Okay.  You're sure?
>
> MR. TERRIO:       Yes.

Defense counsel later challenged Terrio for cause based on his steadfast conviction

that the defendant should testify if he were truly innocent.[102]   Defense counsel

acknowledged that the district attorney tried to rehabilitate Terrio, but he felt that Terrio

---

[99]Id.

[100]Id.

[101]Id., p. 1301.

[102]Id., p. 1310.

65

still did not care what the law was.  Defense counsel was not convinced of Terrio's sincerity in stating to the court that he could be fair or would follow the law.[103]  After hearing the arguments of counsel, the court found that Terrio never said that he would not follow the law, only that he disagreed with it and found it difficult to follow.[104]  The court determined that Terrio had been rehabilitated through the follow-up questioning, after which Terrio stated that he would follow the law as instructed.[105] The state trial court denied the challenge for cause on that basis. Defense counsel later used a peremptory challenge to exclude Terrio from the jury.[106]

In denying the challenge for cause, the state trial court considered all of the comments made by Terrio.  The court found that Terrio had been rehabilitated and would follow the law, including the fact that Raymond did not have to take the stand.  These finding were given deference and affirmed by the Louisiana Fifth Circuit on direct appeal, in which that court also found that Terrio "demonstrated the willingness and ability to decide the case impartially according to the law and evidence."[107]

---

[103]Id., pp. 1310-11.

[104]Id., pp. 1311-12.

[105]Id., p. 1312.

[106]Id., p. 1313.

[107]State v. Raymond, 13 So.3d at 587; St. Rec. Vol. 8 of 9, 5th Cir. Opinion, 08-KA-1204, p. 14, 4/28/09.

The record supports the state courts' findings that Terrio ultimately indicated his ability to be fair and impartial, in that he could reach a verdict based on the evidence and not on Raymond's decision not to testify.  "A potential juror may be rehabilitated by counsel or the court; if it becomes apparent that the juror could follow the law in accordance with his oath and the court's instructions, denial of a challenge for cause would be proper, and the challenged venireman could serve on the jury." Chappell v. Cockrell, 37 F. App'x 88, 2002 WL 971530, at *11 (5th Cir. Apr. 29, 2002).  The state courts' determination that Terrio had in fact been rehabilitated and could be fair and impartial is supported by the record and is entitled to deference.

The record demonstrates that, while Terrio at first indicated that he wanted to hear Raymond testify, he ultimately voiced his understanding that the right not to testify was the law.  He indicated that he would base his decision on the evidence and require the State to meet its burden of proof on each element of the crime.  He ultimately affirmed for the state trial court that he would follow the law as instructed, even if that meant that the defendant had the right to not testify.

The factual finding of fairness and the denial of the challenge for cause by the state trial court were supported by the record and are entitled to deference.  The state courts' denial of relief was not contrary to, or an unreasonable application of, Supreme Court law.  Raymond is not entitled to relief on this claim.

## RECOMMENDATION

For the foregoing reasons, it is **RECOMMENDED** that Raymond's petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[108]

New Orleans, Louisiana, this _____3rd_____ day of May, 2013.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[108]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.